FRANCIS E. DADDARIO *vs.* CAPE COD COMMISSION.

No. 00-P-1851.

Suffolk. September 17, 2002. - December 18, 2002.

Present: CYPHER, McHUGH, & KAFKER, JJ.

*Cape Cod Commission. Constitutional Law,* Taking of property, Vagueness of statute, Equal protection of laws. *Due Process of Law,* Vagueness of statute.

A Land Court judge, reviewing on remand from the Supreme Judicial Court an action brought by a plaintiff seeking review of a decision of the Cape Cod Commission (commission) denying him a permit to mine sand and gravel on a locus on Cape Cod, correctly declined to revisit the plaintiff's claim that the commission's decision constituted a taking, where the Supreme Judicial Court had concluded that the takings claim was not ripe for review, and where the plaintiff failed to demonstrate that the takings claim fell within the narrow futility exception to the requirement for a final decision. [768-770]

In an action brought by a plaintiff seeking review of a decision of the Cape Cod Commission (commission) denying him a permit to mine sand and gravel on a locus on Cape Cod, the judge properly dismissed the plaintiff's claim that the commission's enabling act, St. 1989, c. 716, was, as applied, void for vagueness, where the act set out well-defined objectives and standards that were applied by the commission, and where the plaintiff failed to demonstrate any error in the commission's application of those standards. [770-772]

In an action brought by a plaintiff seeking review of a decision of the Cape Cod Commission (commission) denying him a permit to mine sand and gravel on a locus on Cape Cod, the judge properly dismissed the plaintiff's unsupported, generalized claim that the commission's decision violated his rights to equal protection of the laws. [772-774]

CIVIL ACTION commenced in the Land Court Department on March 1, 1995.

Following review by the Supreme Judicial Court, 425 Mass. 411 (1997), the case was heard by *Peter W. Kilborn,* J.

*Thomas O. Moriarty* for the plaintiff.

*H. Hamilton Hackney, III (Eric W. Wodlinger* with him) for the defendant.

KAFKER, J. The plaintiff, Francis E. Daddario, sought a permit to mine sand and gravel on thirty-two acres of a seventy acre parcel (locus) on Cape Cod. The Cape Cod Commission (commission), established by St. 1989, c. 716 (Act),[1] and charged by the Legislature with regulating "developments of regional impact" (DRIs)[2] on the Cape, denied the permit. Next, a judge of the Land Court ruled that the commission's decision constituted a taking, but did not address the plaintiff's other claims. The Supreme Judicial Court reversed the takings decision, relying on "both the Federal ripeness doctrine and regulatory taking principles," and remanded the case to the Land Court for further proceedings. *Daddario* v. *Cape Cod Commn.*, 425 Mass. 411, cert. denied, 522 U.S. 1036 (1997). On remand, another judge of the Land Court (the first judge had retired), decided, based on the Supreme Judicial Court's analysis in *Daddario*, to decline any further consideration of the takings claim. The judge also granted the commission's renewed motion to dismiss, under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), the plaintiff's claims that the Act was void for vagueness and, as applied, violated the plaintiff's rights to equal protection of the laws.[3] The plaintiff appeals the Land Court's decision on remand. We affirm.

*Background.* 1. *The Act and the regional policy plan.* The Act recognizes the "unique natural, coastal, scientific, historical, cultural, architectural, archaeological, [and] recreational values" of the Cape. § 1(*a*) of the Act. It declares that these values are being "threatened and may be irreparably damaged by uncoordinated or inappropriate uses of the region's land and other resources." *Ibid.*

The purpose of the Act is to protect the Cape's unique natural

---

[1]Chapter 2 of St. 1990 amended §§ 18 and 21 of the Act, which have no bearing on the matter before us.

[2]A DRI is defined by statute to be a "development which, because of its magnitude or the magnitude of its impact on the natural or built environment, is likely to present development issues significant to or affecting more than one municipality." § 2(*h*) of the Act. There is no question that the development at issue meets that definition.

[3]In an earlier decision by the Land Court judge after remand, the plaintiff's claim that the commission's decision was arbitrary and capricious, and that the permit denial violated the Act, was rejected based on the record developed at the original trial. That decision has not been appealed.

and man-made environment and provide for "balanced and sustainable economic development." § 1 of the Act. The Act establishes a process for commission review of DRIs, along with standards and criteria for the review based on factors including:

> "the impact of the development on the environment and natural resources . . . [and on] existing capital facilities, . . . the physical size of the development . . . the amount of pedestrian and vehicular traffic [generated by] the development . . . the anticipated number of new residents or employees generated . . . [and] the importance of the development to economic development in the region."

§ 12(b) of the Act.

The commission is directed to approve DRIs if, inter alia:

> "the probable benefit from the proposed development is greater than the probable detriment; [and] . . . the proposed development is consistent with the regional policy plan and . . . the proposed development is consistent with municipal development by-laws."

§ 13(d) of the Act.

Notwithstanding these requirements, the commission is required to "approve or approve with conditions a development of regional impact where an applicant demonstrates that to disapprove the development of regional impact would constitute a taking of property in violation of the Massachusetts and United States Constitutions; provided, however, that no reasonably foreseeable danger to the public health or safety will arise from such approval or approval with conditions." § 13(f) of the Act.

The Act requires the commission to prepare a regional policy plan to "reflect and reinforce" the objectives set out in the statute, § 7(a) of the Act, and establishes a public process for its formulation. The plan developed by the commission includes "minimum performance standards" for applicants proposing DRIs, including requirements that developments be designed to minimize impacts on wildlife, plant habitat, and the alteration

of natural topography.[4] Commercial developments with regional impacts are required permanently to maintain forty percent of the lot being developed, excluding wetlands, as open space.

2. *Daddario's proposal.* The plaintiff owns seventy acres of land off Thomas Landers Road in Falmouth. The locus is undeveloped forested land with wetlands and a vernal pool, and is zoned for agricultural purposes. It abuts existing gravel operations, a residential subdivision, a great pond, and town-owned conservation property. It is within the zone of contribution to the Mares Pond public supply well and numerous private wells.

The plaintiff's proposal calls for thirty-two acres of sand and gravel extraction in seven sequential phases, each involving five acres or less. The proposal includes a two hundred foot buffer zone around the perimeter of the development. At the completion of the mining, the plaintiff proposes to develop the property for residential use. The plaintiff states the project would be beneficial for the area because of its potential to create jobs in the local community, increase the local availability of reasonably priced gravel, decrease the amount of vehicular traffic on the Cape caused by bringing in gravel, and increase town tax revenues while comporting with similar activity in the area.

The plaintiff rejected an alternative proposal by the commission that would have allowed mining on twenty-five acres. *Daddario*, 425 Mass. at 417.

3. *The commission's action.* The commission determined that "[m]ining the site would remove approximately [thirty-two] acres of mature, natural plant and wildlife habitat that could not be replaced through the proposed reclamation of the site." The commission also found that the project design failed to minimize (1) the impact on wildlife and plant habitat and (2) alteration of natural topography, in violation of minimum performance standards 2.4.1.1B.1 and 2.4.1.1B.2 of the regional policy plan.

[4]See, e.g., minimum performance standard 2.4.1.1B.1 of the regional policy plan ("[a]pplications for [DRIs] that . . . alter . . . areas [of general wildlife and plant habitat] shall contain a wildlife and plant habitat assessment. Such assessments shall . . . be a guide for the layout of the development. Developments shall be planned to minimize impacts to wildlife and plant habitat"); minimum performance standard 2.4.1.1B.2 ("[c]learing of vegetation and alteration of natural topography shall be minimized, with appropriate vegetation planted as needed to enhance or restore wildlife habitat").

The project also reduced open space and the "applicant refused to agree to any permanent restriction of open space in violation of [minimum performance standard] 6.1.5."

The commission further found that the proposal presented risks of groundwater contamination by bringing the land surface to within ten feet of the groundwater table. The commission also identified the soils in the locus as "transmissive."

The commission discounted the benefits claimed by the plaintiff, finding that the "project would not contribute to a balanced economy consistent with Cape Cod's environmental strengths and constraints." It (1) described mining as a "consumptive activity," (2) remarked on the "widespread availability" of sand and gravel on the Cape, and (3) found that the project had not been designed to minimize environmental impacts.

The commission concluded that the "probable benefit does not outweigh the project's probable detriment," and that the plaintiff had not met the minimum performance standards of the regional policy plan.

*Discussion.* 1. *The takings claim.* Over the plaintiff's objection, the Land Court judge on remand declined to further consider the takings claim because he concluded that the Supreme Judicial Court in *Daddario* had determined that the takings claim was not ripe. In a novel interpretation of *Daddario*, the plaintiff argues that the Land Court erred because the Supreme Judicial Court remanded the matter for a further determination whether his takings claim was ripe for adjudication based on additional analysis by the Land Court of the economic value of the locus. The plaintiff has misunderstood the essential point of the Supreme Judicial Court's decision, which is that, without further interaction between the commission and the plaintiff, the extent of the regulation and the resulting value of the locus cannot be determined, and therefore any takings claim is premature.

The court in *Daddario* emphasized that a regulatory takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Daddario*, 425 Mass. at 414, quoting from *Williamson*

*County Regional Planning Commn.* v. *Hamilton Bank*, 473 U.S. 172, 186 (1985). This involves "a final determination on the nature and extent of development that the commission will permit." *Daddario*, 425 Mass. at 415. The rationale is that a "court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *Ibid.*, quoting from *MacDonald, Sommer & Frates* v. *County of Yolo*, 477 U.S. 340, 348 (1986). Compare *Palazzolo* v. *Rhode Island*, 533 U.S. 606, 620 (2001) (where "permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened").

In the instant case, the plaintiff has submitted a single permit application to the commission in which he proposed to mine thirty-two acres of the property. In response, the "commission's staff proposed a plan which would have permitted sand and gravel extraction on twenty-five acres [in different sites with less environmental impact], but the plaintiff declined to consider this alternative or modify his proposal." *Daddario*, 425 Mass. at 417. The plaintiff contends that this proposal would have required him to excavate in violation of local zoning by-laws and therefore it was not feasible. Without further interaction between the plaintiff and the commission, however, it is not possible to determine whether any economically viable sand and gravel mining operation acceptable to the commission could be identified.[5] The same is true for other uses, such as a residential housing development, proposed by the plaintiff for construction upon completion of sand and gravel excavation from the land.

The plaintiff's contention that further interaction with the commission would have been futile was not addressed directly by the court in *Daddario*, but his argument is inconsistent with

---

[5] See *Daddario*, 425 Mass. at 417 ("[t]he denial of a particular plan cannot be equated with a refusal to permit any development"). See also *MacDonald, Sommer & Frates* v. *County of Yolo*, 477 U.S. at 351 (developer who submitted one large subdivision proposal and was rejected had not received a final decision about how regulations would be applied to property); *Palazzolo* v. *Rhode Island*, 533 U.S. at 620 (case that is ripe is "quite unlike those . . . which arose when an owner challenged a land-use authority's denial of a substantial project, leaving doubt whether a more modest submission or an application for a variance would be accepted").

the court's ripeness analysis. Moreover, while there is a narrow futility exception to the requirement for a final decision before a takings claim is ripe, "[t]o come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." *Gilbert* v. *Cambridge*, 932 F.2d 51, 61 (1st Cir.), cert. denied, 502 U.S. 866 (1991). See *Wilson* v. *Commonwealth*, 31 Mass. App. Ct. 757, 766, *S.C.*, 413 Mass. 352 (1992). The record does not reflect that further interaction between the plaintiff and the commission would be futile. Rather, such interaction was necessary to test and clarify the extent of development on the locus the commission would find acceptable.[6]

The Land Court judge on remand, therefore, correctly declined to revisit the takings claim.

2. *Void for vagueness.* The plaintiff contends that the language of § 13(*d*)(1) of the Act is void for vagueness because it requires the commission to compare probable benefits to probable detriments and if, in the commission's opinion, the probable benefits do not outweigh the probable detriments, it can deny the permit. He claims that the denial of the permit based on § 13(*d*)(1) violates substantive due process principles.

For the plaintiff to succeed on a void for vagueness argument, the statute must be "so vague that 'men of common intelligence must necessarily guess at its meaning and differ as to its application,' " thereby allowing " 'untrammeled [administrative] discretion' . . . and arbitrary and capricious decisions in violation of the due process clause of the Fourteenth Amendment . . . and of art. 10 of the Massachusetts Declaration of Rights." *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 363-364 (1973) (citations omitted). In making this determination we review the statute as a whole, *id.* at 364, as well as the administrative actions further defining the statute. See *Brookline* v. *Commissioner of the Dept. of Envtl.*

---

[6]The Supreme Judicial Court did not prejudge the outcome of that interaction. For example, the court did not rule out the possibility that further interaction between the plaintiff and the commission would demonstrate that the plaintiff's proposal was the only economically viable one for the site. *Daddario, supra* at 417 n.4. The court's skepticism, however, that any regulatory taking could eventually be established is readily apparent from the rest of the opinion, particularly *id.* at 418 n.5.

*Quality Engr.*, 387 Mass. 372, 379 (1982); *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 780 (2002). As the Act regulates business activities and does not concern either criminal activity or First Amendment freedoms, "we limit our vagueness analysis to whether [the statute . . .] is unconstitutionally vague as applied in [the particular] case." *Gurry* v. *Board of Pub. Accountancy*, 394 Mass. 118, 127 (1985), quoting from *Caswell* v. *Licensing Commn. for Brockton*, 387 Mass. 864, 873 (1983).

We have no difficulty concluding that the plaintiff's argument that the Act as applied is void for vagueness and, therefore, a violation of substantive due process is without merit. As the Massachusetts courts and the First Circuit have emphasized, "[d]ue process . . . claims are very seldom the means to seek review of the actions of land use agencies," *Wyman* v. *Zoning Bd. of Appeals of Grafton*, 47 Mass. App. Ct. 635, 636 (1999), absent "truly horrendous situations." *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 560, cert. denied, 516 U.S. 931 (1995), citing *Nestor Colon Medina & Sucesores, Inc.* v. *Custodio*, 964 F.2d 32, 45 (1st Cir. 1992). Here we have no allegations even approaching such an abuse of governmental power.

The statute has a well-defined and rational basis: to protect the unique natural and man-made environment of Cape Cod and to promote sustainable economic development on the Cape consistent with that environment. See *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. at 779 (no due process violation under Federal or State Constitutions where "challenged regulations further plausible legislative objectives through reasonable means"). The Act establishes criteria for the commission's evaluation of DRIs and requires it to develop even more detailed plans and guidelines in the regional policy plan. Those criteria provide a framework for the "probable benefits and detriments" analysis in question. In carrying out its statutory responsibilities, the commission established minimum performance standards. These standards are directly related to the statutory purposes.

In its decision, the commission applied the statutory tests and the regional policy plan's minimum performance standards and

found that the plaintiff had not satisfied either.[7] Although the plaintiff's complaint contains conclusory statements that the probable benefits of his proposal outweigh any alleged or perceived detriments, it does not identify what those benefits are or how they outweigh the adverse environmental effects the commission considered when it applied the statutory criteria. The complaint claims, in a similarly conclusory fashion, that the plaintiff has satisfied the minimum performance standards. Far more is required of a plaintiff challenging the constitutionality of a statute on vagueness and substantive due process grounds on the basis that he was denied a land use permit. See generally *Wyman* v. *Zoning Bd. of Appeals of Grafton*, 47 Mass. App. Ct. at 636-637; *Chiplin Enterprises, Inc.* v. *Lebanon*, 712 F.2d 1524, 1527-1528 (1st Cir. 1983); *Amsden* v. *Moran*, 904 F.2d 748, 757 (1st Cir. 1990) ("[c]harges that substantive due process was denied cannot rest on conclusory allegations or rhetoric alone").

Here we have well-defined objectives and standards set out in the Act and regional policy plan and an application of those standards by the commission. This application is challenged in a complaint that is particularly meager regarding the benefits and detriments analysis that is the subject of the void for vagueness challenge. Moreover, the project, due to its nature and size — the mining of thirty-two acres of open space with valuable habitat — raises core statutory concerns that are assigned to the commission for review and resolution. The Land Court properly dismissed the void for vagueness, substantive due process challenge to the statute.[8]

3. *Equal protection.* The plaintiff also contends that he was denied equal protection of the laws in violation of the Massachusetts and United States Constitutions. The courts of this

---

[7]For the purpose of analyzing the rule 12(b)(6) motion on the constitutional claims, we take the plaintiff's factual allegations to be true, see *Wyman* v. *Zoning Bd. of Appeals of Grafton*, 47 Mass. App. Ct. at 636, and do not rely on the Land Court's fact-finding in its earlier decision on the statutory claim (see note 3, *supra*).

[8]As it is clear that the statute as applied is not impermissibly vague, and the commission has not engaged in arbitrary and capricious decision-making, see note 3, *supra*, we need not belabor the various substantive due process tests, or whether the plaintiff has alleged a sufficient property interest for these purposes. See *Pittsley* v. *Warish*, 927 F.2d 3, 6 (1st Cir. 1991).

Commonwealth and the First Circuit have emphasized that the denial of a land use permit does not rise to a constitutional violation absent special considerations. "Liability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Rubinovitz* v. *Rogato*, 60 F.3d 906, 909-910 (1st Cir. 1995) (citations omitted). As this court has stated, the "allegation that others similarly situated obtained permits is not, without more, a denial of equal protection of the laws. Allegations of clear and intentional discrimination are required." *Rosenfeld* v. *Board of Health of Chilmark*, 27 Mass. App. Ct. 621, 628-629 (1989). See *Snowden* v. *Hughes*, 321 U.S. 1, 8 (1944) ("[t]he unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination"). Finally, the liberal notice pleading requirements embodied in Mass.R.Civ.P. 8(a), 365 Mass. 749 (1974), see *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 191 (1982), do not countenance pleadings composed solely of conclusory labels. See, e.g., *Romero* v. *Otero*, 678 F. Supp. 1535, 1537 (D.N.M. 1987) (allowing a motion to dismiss, inter alia, on an equal protection claim, the court stated, "While a detailed listing of facts is not required, general legal conclusions will seldom satisfy the pleader's duty to state the grounds upon which the claim rests. Conclusory allegations are not sufficient to withstand a motion to dismiss when no facts are alleged to support the conclusion").

The plaintiff does not allege that impermissible considerations such as race, religion, or the punishment of the exercise of constitutional rights entered into the commission's decision. Contrast *Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886). Nor does he allege intentional discrimination for any other reason. The original complaint did not even reference other sand and gravel sites that had been granted permits by the commission, although

at oral argument on the motion to dismiss, the plaintiff alleged, and counsel for the commission agreed for the purpose of the motion, that "at least four other, similar mining operations were approved by the commission." Nothing more was alleged. At most we have a general allegation, without any specifics, that others similarly situated were granted permits. This is not enough to support an equal protection claim, even on a motion to dismiss.[9]

*Judgment affirmed.*

---

[9]The plaintiff relies heavily on the Supreme Court's abbreviated decision in *Village of Willowbrook* v. *Olech,* 528 U.S. 562 (2000). In that case, in which the complaint was apparently replete with allegations of improper considerations and individualized treatment, the Court stated that allegations of intentional and "wholly arbitrary" discrimination were sufficient without reaching "the alternative theory of 'subjective ill will.' " *Id.* at 565. In the instant case, this distinction does not salvage the plaintiff's claims. As explained above, allegations that others similarly situated obtained permits is not the equivalent of intentional and arbitrary discrimination. *Rosenfeld* v. *Board of Health of Chilmark, supra.*